JAMES P. FOGELMAN, SBN 161584
jfogelman@gibsondunn.com
JESSE A. CRIPPS, SBN 222285
jcripps@gibsondunn.com
SHELDON A. EVANS, SBN 287034
sevans@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Attorneys for Plaintiff
INDEPENDENT SPORTS & ENTERTAINMENT, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

INDEPENDENT SPORTS & ENTERTAINMENT, LLC, a limited liability company,

Plaintiff,

v.

DANIEL FEGAN, an individual,

Defendant.

CASE NO. 2:17-cv-02397

**NOTICE OF MOTION AND MOTION TO REMAND BY PLAINTIFF INDEPENDENT SPORTS & ENTERTAINMENT, LLC; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Assigned to the Hon. André Birotte, Jr.

Removed from L.A. Superior Court (Case No. BC653140)

Action Filed: March 10, 2017
Removal Filed: March 28, 2017

Hearing Date: May 1, 2017
Time: 10:00 a.m.

Trial Date: None set

PLEASE TAKE NOTICE THAT on May 1, 2017 at 10:00 a.m., or as soon as the matter may be heard by the Honorable André Birotte Jr. of the United States District Court for the Central District of California, located at 350 West First Street, Los Angeles, California, Plaintiff Independent Sports & Entertainment, LLC ("ISE" or the "Company") will and hereby does move this Court for an order immediately remanding the above-captioned case to the Honorable Amy D. Hogue, Department 86 of the Superior Court of the State of California for the County of Los Angeles, Case No. BC653140.

Remand is appropriate because this Court lacks subject-matter jurisdiction. The merits of the disputes between Plaintiff ISE and Defendant Daniel Fegan ("Fegan") will be decided in binding arbitration before JAMS pursuant to the arbitration provisions contained in the executed Acquisition and Purchase Agreement ("APA") and Employment Agreement ("EA") between the parties, but ISE sought by way of the Complaint it filed in the Los Angeles Superior Court emergency and preliminary injunctive relief against Fegan pending the outcome of the JAMS arbitrations or the expiration of Fegan's non-compete obligations in the APA in February 2018.

After the Honorable Mary H. Strobel of the Los Angeles Superior Court granted a Temporary Restraining Order ("TRO") and an Order to Show Cause regarding the issuance of a Preliminary Injunction ("OSC") against Fegan on March 17, 2017, and set the hearing on ISE's Motion for Preliminary Injunction ("MPI") for April 7, Fegan filed a 170.6 preemptory challenge to Judge Strobel, and after the matter was assigned to Judge Hogue, Fegan filed its improper removal of the action to this Court based on patently inapplicable federal preemption grounds. There is not, and cannot be, federal preemption over pre-arbitration injunctive relief based on the APA dispute over Fegan's breach of the APA governing ISE's acquisition of Fegan's business for $20 million. It was only after Judge Strobel's granting of a TRO against Fegan preventing him from breaching the non-compete provisions of the APA, and finding that ISE had established a likelihood of success of proving that Fegan had committed "willful

misconduct" justifying the termination of Fegan for cause, that Fegan even raised the frivolous argument that federal preemption principles govern the dispute. The removal was brought for the improper purpose of preventing ISE from obtaining a preliminary injunction on April 7, and apparently so that Fegan could violate the TRO, as Fegan's counsel wrongly stated on March 30 that Fegan viewed the TRO as "void and unenforceable."

Fegan's arguments to remove this case, based on the complete preemption doctrine of section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, are without merit. The dispute between ISE and Fegan does not concern the collective bargaining agreement ("CBA") or the regulations of the National Basketball Players Association ("NBPA"), as Fegan contends. These documents do not confer exclusive rights for Fegan to own a competing business or to work for a competitor in violation of the APA and Fegan cannot avoid either the binding arbitration provision or the binding non-compete provision contained in the APA that served as the basis for the TRO and that will serve as the basis for the preliminary injunction to which ISE is entitled pending the outcome of the JAMS arbitration. ISE neither sought nor obtained injunctive relief that is governed by the CBA or NBPA regulations and none of the relief sought by ISE from JAMS or the Los Angeles Superior Court require any interpretation of the CBA or NBPA regulations.

Complete preemption is also inapplicable in this case because the LMRA does not supplant ISE's state law claims as there is no analogous federal law claim that ISE could have pursued to enforce the non-compete provisions in the APA, and because the merits of the dispute will be decided by JAMS based on the parties' arbitration agreement, not by any state or federal court. Additionally, Fegan waived any alleged right to remove this case by his actions in the Los Angeles Superior Court. Fegan had many opportunities to raise his removal arguments, but chose to litigate the matters in the Los Angeles Superior Court until he lost the TRO and the case was subsequently re-assigned to Judge Hogue.

The proper remedy is thus to remand this case to the state court from which the case was removed, *i.e.*, the court of the Honorable Amy D. Hogue, the Superior Court of the State of California for the County of Los Angeles, Case No. BC653140, so that ISE can obtain the preliminary injunction to which it is entitled and the parties can proceed with the JAMS arbitration over the merits, as they agreed to do in the APA and EA.

This Motion is based upon this Notice and Motion, the attached Memorandum of Points and Authorities, the declarations filed concurrently with ISE's Motion for a Preliminary Injunction, all papers filed in this case, any oral argument that may be heard by the Court, and any other matters the Court deems appropriate.

This Motion is made following conference of counsel pursuant to Local Rule 7-3, which took place on March 29, 2017. Due to the odd procedural posture of this case, the expedited nature of this relief, and Fegan's recent removal to this court, counsel has good cause for providing notice after the deadline of Local Rule 7-3.

Dated: March 31, 2017

Gibson, Dunn & Crutcher LLP

By: *<u>/s/ James P. Fogelman</u>*
James P. Fogelman

Attorneys for Plaintiff Independent Sports & Entertainment, LLC

# TABLE OF CONTENTS

Page


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 3

A. The Parties and Their Private Agreement Under the APA ........ 3

B. Fegan's Damaging Conduct Against ISE Underlying The Disputes ........ 5

C. Procedural History ........ 7

III. LEGAL STANDARD ........ 10

IV. ARGUMENT ........ 11

A. Removal was Improper because the CBA Does not Establish an Exclusive Right for Fegan to Own a Business and Does Not Require the Interpretation of the CBA ........ 11

1. The CBA and NBPA Regulations Do Not Provide the Exclusive Right for Fegan to Own a Business or Work for a Competitor of ISE in Contravention of the APA ........ 12

2. ISE's Injunction Does Not Require the Court to "Interpret" the CBA or NBPA Regulations ........ 14

B. Removal was Also Improper because ISE Could Not Have Brought its Claim Against Fegan under a Federal-Law Cause of Action ........ 17

C. Removal was Also Improper because Fegan's Extensive, Substantive, and Voluntary Use of the State Court System, and the Rights Afforded to Him Thereunder, Waived any alleged Right to Remove to Federal Court ........ 18

V. CONCLUSION ........ 20

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Allis-Chalmers Corp. v. Lueck*,
471 U.S. 202 (1985)........................................................................................11

*Balcorta v. Twentieth Century-Fox Film Corp.*,
208 F.3d 1102 (9th Cir. 2000)....................................................................12, 15

*Burnside v. Kiewit Pacific Corp.*,
491 F.3d 1053 (9th Cir. 2007)..........................................................................12

*Caterpillar, Inc. v. Williams*,
482 U.S. 386 (1987)....................................................................................10, 11

*Collins v. Nat'l Basketball Players Ass'n*,
850 F. Supp. 1468 (D. Colo. 1991), *aff'd*, 976 F.2d 740 (10th Cir. 1992)...........................................................................................................13

*Cramer v. Consolidated Freightways, Inc.*,
255 F.3d 683 (9th Cir. 2001).................................................................14, 15, 16

*Emrich v. Touche Ross & Co.*,
846 F.2d 1190 (9th Cir. 1988)..........................................................................10

*Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Trust for S. Cal.*,
463 U.S. 1 (1983)............................................................................................11

*Gaus v. Miles, Inc.*,
980 F2d 564 (9th Cir. 1992)............................................................................10

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers, Local No. 70 of Alameda County*,
415 U.S. 423 (1974)........................................................................................10

*Humble v. Boeing Co.*,
305 F.3d 10048 (9th Cir. 2002)........................................................................14

*Kobold v. Good Samaritan Reg'l Med. Ctr.*,
832 F.3d 1024 (9th Cir. 2016)..........................................................................12

Gibson, Dunn & Crutcher LLP

*Livadas v. Bradshaw*,
512 U.S. 107 (1994) .......... 12

*Moore v. Permanente Medical Group, Inc.*,
981 F.2d 443 (9th Cir. 1992) .......... 19, 20

*Nishimoto v. Federman-Bachrach & Assocs.*,
903 F.2d 709 (9th Cir. 1990) .......... 10

*Ramirez v. Fox Television Station, Inc.*,
998 F.2d 743 (9th Cir. 1993) .......... 15

*Steinberg, Moorad &Dunn, Inc. v. Dunn*,
No. CV 01-7009 (C.D. Cal. Feb 6, 2003) .......... 13

*White v. Nat'l Football League*,
92 F. Supp. 2d. 918 (D. Minn. 2000) .......... 13

*Young v. Anthony's Fish Grottos, Inc.*,
830 F.2d 993 (9th Cir. 1987) .......... 18

**Statutes**

28 U.S.C. § 1441(a) .......... 10

29 U.S.C. § 185 .......... 2

29 U.S.C. § 185(a) .......... 10, 18

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

The only reason this action was improperly removed to federal court is because Defendant Daniel Fegan ("Fegan") is attempting to avoid complying with the Temporary Restraining Order ("TRO") properly issued against him by the Honorable Mary H. Strobel, and to run out the clock on the injunctive relief that Plaintiff Independent Sports & Entertainment, LLC ("ISE" or the "Company") obtained by preventing the Honorable Amy D. Hogue from deciding ISE's Motion for Preliminary Injunction ("MPI") at the hearing scheduled to take place on April 7. Fegan filed his removal papers the night before his opposition to ISE's MPI was due, and only after he had both lost the TRO and filed a 170.6 preemptory challenge to Judge Strobel and the matter had been reassigned to Judge Hogue. Fegan may even be in contempt of the TRO at this very moment based on his counsel's shocking statement on March 30, after they improperly removed this case, that Fegan views the TRO as "void and unenforceable." Fegan's abuse of the federal removal process is forum shopping and procedural gamesmanship at its worst. The matter should be remanded back to the Los Angeles Superior Court so that ISE can maintain the preliminary injunctive relief to which it is entitled pending the outcome of the binding JAMS arbitration over the merits of the parties' disputes, pursuant to the arbitration provisions contained in the executed Acquisition and Purchase Agreement ("APA") and Employment Agreement ("EA") between the parties.

The only matter addressed in ISE's Complaint in Los Angeles Superior Court is preliminary injunctive relief pending the outcome of the JAMS arbitration. No court will determine the merits of the parties' dispute over Fegan's breach of the APA that the parties entered into in connection with the $20 million acquisition of Fegan's NBA agency business in 2013, and that contains the non-compete provisions that formed the basis of the TRO. This Court lacks subject matter jurisdiction over ISE's limited Complaint for injunctive relief and, therefore, must remand the matter back to the state

court. This Court also has the discretion to remand the case back to the state court because Fegan's actions in the state court constituted a waiver of any right to even seek the removal of the Complaint to federal court.

There is not, and cannot be, federal preemption over pre-arbitration injunctive relief based on the APA. It was only after Judge Strobel's granting of the TRO against Fegan preventing him from breaching the non-compete provisions of the APA, and finding that ISE had established a likelihood of success of proving that Fegan had committed "willful misconduct" justifying the termination of Fegan for cause, that Fegan even raised the frivolous argument that federal preemption principles govern the dispute. The removal was brought for the improper purpose of preventing ISE from obtaining a preliminary injunction on April 7 and to, therefore, "run out the clock" on the TRO, to the extent that Fegan is even complying with the TRO, which is now in great doubt.

Fegan's arguments to remove this case, based on the complete preemption doctrine of section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, are without merit. The dispute between ISE and Fegan does not concern the collective bargaining agreement ("CBA") or the regulations of the National Basketball Players Association ("NBPA"), as Fegan contends. These documents do not confer exclusive rights for Fegan to own a competing business or to work for a competitor in violation of the APA and Fegan cannot avoid either the binding arbitration provision or the binding non-compete provision contained in the APA that served as the basis for the TRO and that will serve as the basis for the preliminary injunction to which ISE is entitled pending the outcome of the JAMS arbitration. ISE neither sought nor obtained injunctive relief that is governed by the CBA or NBPA regulations and none of the relief sought by ISE from JAMS or the Los Angeles Superior Court require any interpretation of the CBA or NBPA regulations.

Complete preemption is also inapplicable in this case because the LMRA does not supplant ISE's state law claims as there is no analogous federal law claim that ISE

could have pursued to enforce the non-compete provisions in the APA, and because the merits of the dispute will be decided by JAMS based on the parties' arbitration agreement, not by any state or federal court. Fegan also waived any alleged right to remove this case by his actions in the Los Angeles Superior Court. Fegan had many opportunities to raise his removal arguments, but chose to litigate the matters in the Los Angeles Superior Court until he lost the TRO and the case was subsequently re-assigned to Judge Hogue.

Fegan repeatedly exercised his rights and remedies under state law and procedure, and only when it no longer looked to be to his advantage did he seek removal. For example:

- Fegan's counsel appeared at three separate TRO and OSC hearings, and filed well over 100 pages in multiple briefs, witness declarations, and exhibits, never once raising any question over the state court's jurisdiction to hear ISE's request for preliminary injunctive relief pending the outcome of the JAMS arbitration;
- On the first day of court proceedings, Fegan invoked his rights under the California Civil Procedure Code to immediately notice multiple depositions of ISE witnesses;
- Fegan served amended deposition notices; and
- After he lost the TRO, Fegan exercised his right under the California Code of Civil Procedure (Section 170.6) to challenge the assigned state court judge, the Honorable Mary Strobel who issued the TRO, and to request a new state court judge. Fegan's challenge was granted and the matter was reassigned.

While none of these actions may, by themselves have been sufficient to constitute a waiver of any alleged right to remove the case, collectively they establish that Fegan intended to have the state court decide the preliminary injunction motion and only changed his mind after he lost the TRO and concluded he would lose the MPI. Under the circumstances, this Court has the discretion to remand the case based on Fegan's waiver of any alleged right to seek removal.

## II. BACKGROUND

### A. The Parties and Their Private Agreement Under the APA

ISE is a sports management company that represents over 300 athletes in the National Basketball Association ("NBA"), National Football League, and Major League Baseball. Fegan is a well-known sports agent who represents NBA clients. In

2013, Fegan and ISE negotiated a deal under the APA in which ISE would acquire Fegan's basketball business assets and goodwill—which included the marketing agreements and fees for Fegan's NBA clients—in exchange for nearly $20 million and stock in ISE. *See* Bauman Decl. ¶ 7, Ex. F § 2.5.[1] As part of this deal, Fegan had already agreed to enter into an employment relationship with ISE as the President of ISE's basketball division, ISE Basketball, LLC ("ISE Basketball"). *Id.* ¶ 6, Ex. D.

Under the APA, Fegan explicitly contracted not to take any action to compete with ISE pursuant to express non-compete and anti-raiding clauses that prohibits Fegan from competing with ISE—or soliciting its employees to compete with ISE—until the non-competition term expires in early 2018. Under the APA, the parties agreed to the following:

> If [Fegan] deprives [ISE] of any of [Fegan's] goodwill or in any manner utilizes his reputation and goodwill in competition with [ISE], [ISE] will be deprived of the benefits it has bargained for pursuant to this Agreement. Accordingly, as an inducement for [ISE] to enter into this Agreement, [Fegan] agrees that for a period of five (5) years after March 15, 2013 (the "Non-competition Period") . . . [Fegan] shall not, without [ISE]'s prior written consent, directly or indirectly, own, manage, operate, join, control or participate in the ownership, management, operation or control of, or be connected as a director, officer, employee, partner, consultant or otherwise with, any profit or non-profit business or organization in the Territory, that engages in the sports marketing, representation, recruiting, and/or management business, or otherwise, directly or indirectly, competes with . . . the Business . . . . (*Id.*, Ex. F § 8.1.)

The non-compete provision was amended in June 2016 to shorten the non-compete period to February 15, 2018 and to provide Fegan with the option to void the non-compete provision if ISE chose to terminate Fegan's employment "without cause." Bauman Decl., Ex. G. Fegan's non-compete obligations remain in effect, and are still enforceable until their expiration next year.

---

[1] Unless otherwise stated, all references to declarations in this Motion cite the testimony of declarations filed in support of ISE's Motion for a Preliminary Injunction, filed concurrently herewith.

**B. Fegan's Damaging Conduct Against ISE Underlying The Disputes**

Despite the covenants contained in the APA, Fegan took numerous damaging actions against ISE to compete with the Company during his tenure as President of ISE Basketball. Not only did Fegan own and operate a side business, Fegan Sports, LLC ("Fegan Sports")—which Fegan used to keep employees, prospective clients, and other business interests away from ISE until such a time when Fegan could steal them for himself after his employment agreement expired. *Id.* ¶ 8; Davis Decl., ¶ 3. Fegan also abandoned his moral compass in devising a plot to unfairly compete with ISE Basketball in order to make it possible for Fegan to take back the very business he sold to ISE in 2013 when his employment term expired, severely damaging ISE in the process. *See* Bauman Decl. ¶¶ 10-12; Davis Decl. ¶ 9.

As part of his plan, Fegan set the stage for a potential mass exodus from ISE Basketball: he manipulated the Company's employees and agents to give their personal loyalty to him and interfered with their ability to sign new long-term employment agreements with ISE Basketball so that he could deliver on the threat of a mass exodus. Bauman Decl. ¶12; Davis Decl. ¶ 9; Dunleavy Decl. ¶¶ 4-5; Lipsett Decl. ¶¶ 9-11; Ratner Decl. ¶¶ 5-6.

As part of his scheme, Fegan sought to turn the employees and agents of ISE Basketball against ISE. In an effort to gain leverage over ISE and to further his own personal and business interests, Fegan expressly refused to negotiate long-term contracts with ISE Basketball's agents when asked to do so. Ratner Decl. ¶ 3. Instead, once these agents' employment agreements expired, he asked them to remain "at-will" so that they would be free to leave the Company with him at the end of his contract. When told that it was not in the Company's interest to have unsigned agents, Fegan said "I don't give a shit about the company." *Id.* Fegan also admitted that he had convinced other ISE Basketball agents to join ranks with him to ensure that none of them would sign any contract with ISE unless all of them signed (i.e., until Fegan got the lucrative contract he wanted). Bauman Decl. ¶ 9; Ratner Decl. ¶ 5. And when the

Company attempted again to procure Fegan's cooperation, Fegan demanded that ISE include "key man" provisions in every agreement that would allow every agent to leave if Fegan left. Bauman Decl. ¶ 9; Ratner Decl. ¶ 5. When ISE refused, Fegan confronted ISE Basketball agents with threats and intimidation, demanding that they swear personal loyalty to Fegan—not ISE—and threatening to ruin the career of agents who dared sign any agreement with ISE. Bauman Decl. ¶ 9-11; Dunleavy Decl. ¶ 5; King Decl. ¶ 7; Lipsett Decl. ¶ 7; Ratner Decl. ¶ 5.

For any agent that signed a contract with ISE over Fegan's objections, Fegan berated, ostracized, and defamed those agents in an attempt to destroy their character and deter other agents from doing the same. Bauman Decl. ¶ 9-11; Dunleavy Decl. ¶¶ 5-8; King Decl. ¶ 7; Lipsett Decl. ¶ 7; Ratner Decl. ¶¶ 5-6. Fegan called such agents "disloyal," "double-agents," stated that these agents had "fucked him over," threatened these agents that they "better not take [his clients]," and even attempted to negatively impact these agents' business dealings by using his power as an executive to freeze them out of interactions with their own business development opportunities with NBA clients. Bauman Decl. ¶¶ 10-12; Davis Decl. ¶ 6; Dunleavey Decl. ¶ 7; King Decl. ¶ 7. Fegan selfishly pushed aside the career interests of the very agents and employees he worked with to further his own self-centered aspirations. King Decl. ¶ 4. It was painfully clear to most agents and employees working under Fegan that he had divided the workplace in a toxic manner into those that were loyal to him, and those that were loyal to ISE; he often told employees to "pick a side" and stated that siding with ISE was the wrong choice. Davis Decl. ¶ 5; Grancio Decl. ¶ 4; Lipsett Decl. ¶ 4.

Because of Fegan's disloyalty, dishonesty, and grievous attempts to subvert ISE's business interests to advance his own agenda, ISE terminated Fegan for cause pursuant to section 6(d) of the Agreement on March 10, 2017. *See* Bauman Decl., Ex. D § 6(d); Ratner Decl. ¶ 10, Ex. A. ISE determined that it had cause to terminate Fegan under this section because of Fegan's "willful misconduct or gross negligence in the performance of [his] duties hereunder or the continuing and repeated willful failure

or refusal to perform," and Fegan's "perpetration of . . . fraud [and] material dishonesty against or affecting [ISE] or any affiliates, or any customer, client, agent, or employee thereof." *Id.* ISE took this action first and foremost to protect its loyal employees from the irreparable and ongoing harm resulting from Fegan's rogue schemes, and to start the healing process to repair the immeasurable damage already done.

Since his termination from the Company on March 10, Fegan's improper behavior continued. He called almost every single key employee in an attempt to potentially induce them to leave ISE and follow him to a new competing venture. Davis Decl. ¶ 13; Dunleavy Decl. ¶¶ 11-12; King Decl. ¶ 9; Lipsett Decl. ¶ 10. He has also induced two of his "loyal" agents to resign from ISE Basketball almost immediately, submitting resignation letters that made it obvious that they were leaving because of Fegan and suggesting that they were leaving to join him to compete against ISE. Bauman Decl. ¶ 20; Ratner Decl. ¶ 11. If this was not enough undeniable evidence that Fegan breached the APA and its non-compete and anti-raiding covenants, one need to look no further than Fegan's own admissions in connection with the TRO hearing where he indicated his intent "to compete, and compete immediately" absent injunctive relief. Evans Decl. ¶ 8, Ex. F (emphasis added). In addition, Fegan attempted to steer ISE clients away from ISE and interfered with marketing contracts that ISE has with players. Davis Decl. ¶ 14; King Decl. ¶ 10.

### C. Procedural History

On the same day that Fegan was terminated, March 10, ISE filed and sent to Fegan and his counsel Demands for Arbitration before JAMS, pursuant to the arbitrations provisions contained in the APA and EA, and a Complaint for Preliminary Injunctive relief filed in Los Angeles Superior Court, along with an ex parte application seeking preliminary injunctive relief on an expedited basis. Evans Decl. ¶¶ 3-4. The ex parte application was assigned to the Honorable Mary H. Strobel. *Id.* at ¶ 6. At the first hearing on March 13, Fegan's counsel demanded to take depositions

of Hank Ratner, the President and Global Chief Executive Officer of ISE, and David Bauman, the General Counsel of the Sports Agency Division and the Senior Vice President & Assistant General Counsel of ISE. *Id.* At the hearing, Fegan's counsel invoked his client's right under the California Code of Civil Procedure to conduct discovery by taking these depositions, stating that ISE "chose to go forward in state court and now they have to abide by [Fegan's] statutory rights in state court, which include the right to do depositions." *Id.*, Ex. C. The state court agreed with Fegan, stating that it would consider granting an OSC hearing on April 13 if at least Mr. Bauman could be deposed before that date. *Id.* at ¶ 6. Also at the hearing, counsel for ISE informed the Court that in light of troubling events after the ex parte papers were filed, ISE would also be seeking a TRO. Judge Strobel asked for the parties to file supplemental briefs and declarations before a second hearing on March 15. After the hearing, Fegan's counsel voluntarily and affirmatively served deposition notices for both Mr. Ratner and Mr. Bauman, citing the California Code of Civil Procedure as his source of authority for doing so. *Id.* at ¶ 7, Exs. D-E. Both parties also filed additional briefing. *Id.* at ¶ 8.

A second hearing was held on the TRO and OSC on March 15, at which Judge Strobel requested still more briefing on the subject, specifically a third series of filings not to exceed five pages. *Id.* at ¶¶ 8-10. ISE filed its 5 page brief on March 16. *Id.* at ¶ 10. Fegan filed over 100 pages of substantive briefing, six new witness declarations, and exhibits on March 16. *Id.* A third hearing was held on March 17. *Id.* at ¶ 11.

At the third hearing, Judge Strobel held that ISE had demonstrated a likelihood of success showing that the Company indeed terminated Fegan justly for cause and that the non-compete clause under the APA was enforceable under California law to restrict Fegan from owning his own business to compete against ISE or working for a competitor. *Id.* at ¶ 12. Fegan's counsel continued to push for depositions of key witnesses, and stated on the record that he would offer Fegan to be deposed if he could depose Bauman. *Id.* at ¶ 14. In addition, under the California Civil Procedure Code,

Fegan through his counsel exercised his right to have an earlier hearing date than the existing April 13 date to which the parties agreed; the hearing on the MPI was rescheduled for April 6. *Id.* at ¶ 13, Ex. I. The parties immediately met and conferred, and stipulated to an expedited briefing schedule for the MPI hearing. *Id.* As Judge Strobel noted, there is nothing at issue in the state court case "except provision[al] relief," and that "in effect, the [state court] lawsuit is resolved as of the date of the OSC Hearing." *Id.*, Ex. H. Both parties agreed that once the state court decided whether to grant injunctive relief to maintain the status quo until the arbitrations were adjudicated, the state court action would be over because the underlying claims will be decided by JAMS. *Id.*

Under the state court's OSC briefing schedule, ISE filed its supplemental MPI its papers on March 20. *Id.* at ¶ 13. On March 21, however, despite having waited for a ruling on the TRO and agreeing to a briefing schedule and hearing date for the MPI, Fegan exercised his right under section 170.6 of the California Code of Civil Procedure to file preemptory challenge to Judge Strobel. *Id.* at ¶ 15, Ex. L. This was obvious forum shopping, but Judge Strobel granted the request and the case was reassigned. The case was subsequently re-assigned to Judge Hogue after ISE filed its own 170.6 challenge to the judge preceding the assignment to Judge Hogue. *Id.* Judge Hogue scheduled the hearing on the MPI for April 7. *Id.*

Fegan continued to push ISE for multiple depositions, asserting rights under the California Civil Procedure Code to take as many as six depositions in as many days. *Id.* at ¶ 14. ISE continued to ask for Fegan to be made available for deposition as well, in accordance with Fegan's counsel's statements on the record. *Id.* ISE, in good faith, offered Mr. Bauman for deposition, and Fegan promptly served an amended notice of deposition under the California Civil Procedure Code. *Id.* Mr. Bauman made the necessary preparations and flew all the way from his home on the East Coast to be deposed. However, on March 23, the eve of the deposition and with less than 24 hours' notice, Fegan's counsel unilaterally cancelled the deposition. *Id.*, Ex. J.

Fegan's opposition to the MPI was due to be filed on March 29. *Id.* at ¶ 13. On the evening of March 28, however, without warning, Fegan filed his removal papers, arguing for the first time that the doctrine of federal preemption applied. *Id.* at ¶ 16.

Counsel for ISE sought an agreement from counsel for Fegan to continue the TRO while the parties brief the remand and MPI before this Court. *Id.* at ¶¶ 17-19, Ex. M. Counsel for Fegan refused. *Id.* Worse still, on March 30, counsel for Fegan stated that they viewed the TRO as "void and unenforceable" and refused to state that Fegan is in compliance with the TRO. *Id.* at ¶ 19, Ex. M. Fegan is wrong,[2] however, it now appears that in addition to forum shopping Fegan is in contempt of the TRO.

## III. LEGAL STANDARD

Under 28 U.S.C. § 1441(a), "[o]nly state-court actions that originally could have been filed in federal court may be removed to federal court by the defendant." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987) (citing 28 U.S.C. § 1441(a)). Courts "strictly construe the removal statute against removal jurisdiction," and "[f]ederal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). "The 'strong presumption' against removal jurisdiction means that the defendant always has the burden of establishing that removal is proper." *Id.* (quoting *Nishimoto v. Federman-Bachrach & Assocs.*, 903 F.2d 709, 712 n.3 (9th Cir. 1990); *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1195 (9th Cir. 1988)).

Section 301(a) of the LMRA provides federal jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization." 29 U.S.C. § 185(a). Federal substantive law governs actions for enforcement of collective bargaining agreements. *See Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 23 (1983). But "not every dispute

---

[2] *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers, Local No. 70 of Alameda Cty.*, 415 U.S. 423, 439 (1974) (A TRO issued by a state court does not lapse upon removal to federal court, but remains in effect until it would have expired under the applicable state court order).

concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is preempted by § 301." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985). In order for there to be § 301 preemption, the plaintiff must plead an action that requires interpretation of the collective bargaining agreement. *Caterpillar*, 482 U.S. at 398. The fact that as part of a defense to a state-law contract action a former employee might raise "a federal question, even a § 301 question" does not mean that the claim is preempted by § 301. *Id*. This is a dispute over the sale of a business for $20 million pursuant to the APA, and the merits of the dispute will be decided by JAMS. The fact that the APA provides for injunctive relief against a breach of the non-compete provisions, and the fact that ISE sought and obtained preliminary injunctive relief based on the APA pending the outcome of the JAMS arbitration, does not in any way implicate federal preemption principles and does not justify the removal of ISE's Complaint for preliminary injunctive relief to federal court.

## IV. ARGUMENT

### A. Removal was Improper because the CBA Does not Establish an Exclusive Right for Fegan to Own a Business and Does Not Require the Interpretation of the CBA

The fatal flaw in Fegan's theory of removal is that his duties and regulation under the CBA and the NBPA regulations are so far removed that ISE's state-court action for pre-arbitral injunctive relief does not require any interpretation of the CBA. At most, it only requires a passing reference to the CBA. Indeed, the injunctive relief at issue is not even based on Fegan's status as a former employee or the EA pursuant to which Fegan was employed. The injunctive relief is based on the APA pursuant to which Fegan sold his business for $20 million.

As Fegan concedes, the Ninth Circuit applies a two-step inquiry to determine whether a state-law claim is preempted. *See Kobold v. Good Samaritan Reg'l Med. Ctr.*, 832 F.3d 1024, 1032–34 (9th Cir. 2016); *Burnside v. Kiewit Pac. Corp.*, 491

F.3d 1053, 1059–60 (9th Cir. 2007). "First, a court must determine 'whether the asserted cause of action involves a right conferred upon an employee by virtue of state law, not by a CBA.'" *Kobold*, 832 F.3d at 1032 (quoting *Burnside*, 491 F.3d at 1059). To do so, a court must focus on the legal character—*i.e.* the legal basis—of the claim, not whether the facts could give rise to a CBA-based grievance. *See id.* at 1033 (citing *Livadas v. Bradshaw*, 512 U.S. 107, 123 (1994)). "'If the right exists solely as a result of the CBA, then the claim is preempted, and [the] analysis ends there.'" *Id.* at 1032 (quoting *Burnside*, 491 F.3d at 1059) (alteration in original). If not, and the claim "exists independently of the CBA," the court moves to the second step. *Id.* at 1032–33 (quoting *Burnside*, 491 F.3d at 1059).

At the second step, the court asks whether the claim "is nevertheless substantially dependent on analysis of a collective-bargaining agreement." *Id.* (quoting *Burnside*, 491 F.3d at 1059) (internal quotations omitted). This determination depends on "whether the claim can be resolved by 'look[ing] to' versus interpreting the CBA. If the latter, the claim is preempted; if the former, it is not." *Id.* at 1033 (quoting *Burnside*, 491 F.3d at 1060) (alteration in original). In this context, the term "interpret" means "something more than 'consider,' 'refer to,' or 'apply.'" *Id.* (quoting *Balcorta v. Twentieth Century-Fox Film Corp.*, 208 F.3d 1102, 1108 (9th Cir. 2000)). Thus, if the state-law claim substantially depends on interpretation of a CBA, it is preempted; if it does not, then it can proceed under state law. *Id.*

### 1. The CBA and NBPA Regulations Do Not Provide the Exclusive Right for Fegan to Own a Business or Work for a Competitor of ISE in Contravention of the APA

Fegan argues at length, quoting the CBA and NBPA regulations liberally, that these documents provide Fegan the "exclusive[]" "right and ability as an NBPA certified Player Agent to represent, solicit, sign and receive current and prospective NBA Players." Notice at ¶ 5. ISE has not sought a preliminary injunction against Fegan's status as a certified Player Agent, however. Indeed, ISE made this painfully

obvious at the hearing on the TRO, contrary to the suggestion in Fegan's removal petition:

> Under the NBA union rules, if a player who was with that agent wants to stay with that agent, even if he leaves the company, they're allowed, as players, to do that. That's why the injunction doesn't seek to void the NBA union rules. We'd never do that. And it explains in great detail what that means. He can't create a new business. "I'm Daniel Fegan and Associates. Come work for me." He can't call ISE employees up and say, "come work for me." He can't tell new NBA players, "hey, I've got my own agency. Come work with me." [His ability to work as an agent is] a separate issue. What we're talking about here is a very narrow scope. He cannot create a competitor to the very business he sold for a lot of money. That was the agreement [under the APA].

Evans Decl., Ex. G. Fegan improperly tries to equate Fegan's certification to act as an NBA agent with his ability to own a competing business or work for a business that competes with the buyer of his former business, ISE. Neither the JAMS Demands nor ISE's request for preliminary injunctive relief seek to bar Fegan from acting as an agent; they address his obligation not to create or work for a competing business. The TRO likewise addresses only this narrow issue – the creation of or employment by a competing business, not Fegan's status as a registered agent. *See* Notice, Ex. D.

Thus, ISE reiterates what it has already made clear before the state court in the hope that Fegan will realize the disconnect in his argument: ISE is not seeking an injunction that revokes or deprives Fegan of his ability to act as an agent under the CBA or NBPA regulations. ISE only seeks to prevent Fegan from contravening a valid non-compete, for which Fegan bargained in exchange for nearly $20 million under the APA, by owning or working for a competing business.

Cases like *Collins v. Nat'l Basketball Players Ass'n*, 850 F. Supp. 1468, 1471 (D. Colo. 1991), *aff'd*, 976 F.2d 740 (10th Cir. 1992), *White v. Nat'l Football League*, 92 F. Supp. 2d 918, 924 (D. Minn. 2000), and *Steinberg, Moorad &Dunn, Inc. v. Dunn*, No. CV 01-7009 (C.D. Cal. Feb 6, 2003), do not hold otherwise. These cases merely establish that even though an NFL or NBA agent is not a direct party to a CBA, that agent is nevertheless governed by some of the terms of the CBA since the respective players unions delegate authority to these agents. Still, however, even if

Fegan is governed by or subject to certain provisions of the CBA and NBPA regulations, he has failed to meet his burden to show that these documents establish the exclusive right for him *to own a business or work for a competitor in violation of a private contract involving the sale of his business*.

Therefore, the CBA and NBPA regulations are not at issue under the first prong of the removability test. While the CBA and NBPA regulations govern a person's certification to act as an agent, they do not establish the exclusive right for an agent to set up a business to compete in violation of the APA

**2. ISE's Injunction Does Not Require the Court to "Interpret" the CBA or NBPA Regulations**

Under the second prong of the removability test, "'[s]ubstantial dependence' on a CBA is an inexact concept, turning on the specific facts of each case, and the distinction between 'looking to' a CBA and 'interpreting' it is not always clear or amenable to a bright-line test." *Cramer v. Consol. Freightways, Inc.*, 255 F.3d 683, 691 (9th Cir. 2001). In *Cramer*, the Ninth Circuit clarified the scope of the LMRA's preemptive effect by holding that "[a] state law claim is not preempted under § 301 unless it necessarily requires the court to interpret an existing provision of a CBA that can reasonably be said to be relevant to the resolution of the dispute." *Id.* at 693; *see also Humble v. Boeing Co.*, 305 F.3d 1004, 1007–08 (9th Cir. 2002) (recognizing that *Cramer* "revised [the] framework for analyzing § 301 preemption and synthesized the considerations involved"). In reviewing the Supreme Court's precedent, the court found that preemption under § 301 was not appropriate where "the legal character of a claim [is] 'independent' of rights under the collective bargaining agreement . . . [and] the bare fact that a collective bargaining agreement will be consulted" does not extinguish the claim. *Id.* at 690–91. Thus, a "reference to or consideration of the terms of a collective-bargaining agreement is not the equivalent of interpreting the meaning of the terms." *Ramirez v. Fox Television Station, Inc.*, 998 F.2d 743, 748 (9th Cir. 1993). In other words, "when the meaning of contract terms are not subject to

dispute, the bare fact that a collective bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Balcorta*, 208 F.3d at 1108. Moreover, the court in *Cramer* was careful to distinguish a bona fide connection between the claim and the CBA and one where the link between the two was "creative" at best, noting that the connection "must reach a reasonable level of credibility." Id. at 692.

In *Cramer*, the issue was whether union employees' state law claims for invasion of privacy and intentional infliction of emotional distress arising out of an employer's alleged secret videotaping of employee restrooms through two-way mirrors were preempted under § 301. The employer argued that because the CBA contained provisions prohibiting camera surveillance in certain circumstances and specified camera surveillance procedures to be used in particular circumstances, these provisions brought its covert surveillance within the purview of the CBA. *Id.* at 693. The court rejected this argument because "[t]he plaintiffs based their claims on the protections afforded them by California state law, without any reference to expectations or duties created by the CBA." *Id.* at 693–94. Thus, the claims were "independent of the CBA and not subject to § 301 preemption." *Id.* at 694. That the CBA mentioned topics that were also included in plaintiffs' claims (i.e., surveillance) did not "change" the court's analysis because "[defendant] cannot create a dispute as to the meaning of the terms of the CBA by picking out terms that refer to" topics that were also included in plaintiffs' claims. *Id.* ("In short, this is a classic example of a defendant's attempt to inject[ ] a federal question into an action that asserts what is plainly a state-law claim [in order to] transform the action into one arising under federal law, thereby selecting the forum in which the claim shall be litigated.") (internal quotations omitted).

*Cramer* is merely one of a long line of cases that have found, even in the sports collective bargaining context, that cases that merely tangentially touch on a CBA are not preempted under § 301 of the LMRA. In *Sprewell v. Golden State Warriors*, 266 F.3d 979 (9th Cir. 2001), a professional basketball claims for intentional interference

with contract and business relations against his team was not preempted by LMRA. *Id.* at 991 ("Insofar as Sprewell's interference claims are predicated on the NBA's and the Warriors' alleged violations of California law . . . those claims can 'be litigated without reference to the rights and duties established in a CBA,' and therefore are not preempted by section 301. (citing *Cramer*, 255 F.3d at 691)). Similarly, in *Williams v. Nat'l Football League*, the court held that professional football players' claim under the Minnesota Consumable Products Act (CPA) was not preempted by the LMRA. 582 F.3d 863, 878–80 (8th Cir. 2009). The NFL argued that the players' claim under the CPA was preempted by section 301 because, "without interpreting the CBA and the Policy, a court cannot determine whether the ban on [an illegal substance] is a bona fide occupational requirement, or necessary to avoid a conflict of interest such that the ban does not violate the CPA." The court rejected the argument, however, and held "the NFL's defenses to liability under the CPA are not relevant to our section 301 analysis." *Id.* at 878–79, n.13 (citing *Cramer*'s holding that "[i]f the claim is plainly based on state law, § 301 preemption is not mandated simply because the defendant refers to the CBA in mounting a defense").

All of the above cited cases present situations in which the state law claims of union employees against their union employer were not preempted due to the nature of the state law claims; how then can ISE's claim be preempted when it is not even a party to the CBA, and when Fegan is similarly not a party to the CBA? There are multiple degrees of separation between ISE and the CBA, pushing ISE's claim for pre-arbitral injunctive relief far outside the purview of requiring any interpretation of the CBA.

Here, ISE does not dispute the terms of the CBA or the NBPA regulations cited by Fegan and W. Gary Kohlman, the General Counsel of the NBPA. These cited provision, however, do not touch upon the separate issue of an agent's ability to own a business or work for a business competing with the very business he sold for $20 million, which is what is at issue in this case. Therefore, at most, the CBA and NBPA

regulations are only being consulted or "looked at" in this case as background documents; ISE's case does not turn on any interpretation of these provisions. Rather, ISE's case turns solely on the enforceability of a completely separate agreement, the APA, which only affects Fegan's ability to own a competing business or work for a competing company. Therefore, ISE's right to enforce the non-compete clause under the APA exists wholly separate from the CBA and NBPA regulations. Here, the only contract provision that is in dispute and that needs to be interpreted is those of the APA between ISE and Fegan, not the CBA, to which neither of the parties to this suit are signatories.

The fact that the merits of the dispute will be decided by binding arbitration before JAMS, and not by any state or federal court, further distinguish the instant case from every case cited by Fegan in his removal papers. The only issue being decided in court is the preliminary injunctive relief pending the outcome of the JAMS arbitrations to which the parties agreed. ISE is aware of no case that has applied federal preemption in this uniquely narrow circumstance, and Fegan has certainly cited no such cases. It simply makes no sense.

**B. Removal was Also Improper because ISE Could Not Have Brought its Claim Against Fegan under a Federal-Law Cause of Action**

Fegan also argues in his Notice that ISE's action is appropriate for removal because "it is a civil action brought in a State court of which the district courts of the United States have original jurisdiction." Notice at ¶ 14. Further, Fegan quotes one of the leading Ninth Circuit cases on the topic, which held that "if federal law completely preempts a state law claim *and supplants* it with a federal claim, the state law claim may be removed to federal court." Notice at ¶ 15 (quoting *Young v. Anthony's Fish Grottos, Inc.*, 830 F.2d 993, 998 (9th Cir. 1987) (emphasis added)). However, neither Fegan nor Mr. Kohlman address what action ISE could have brought against Fegan under federal law, or how section 301 of the LMRA effectively supplants ISE's claim for pre-arbitral injunctive relief with an effective federal law corollary cause of action.

ISE could not bring an action under section 301 of the LMRA, because that section only governs "violation[s] of contracts between an employer and a labor organization." 29 U.SC. § 185(a). ISE is neither an employer of union members, or a union member itself. Thus, it would not be able to sue Fegan under federal law for a violation of a CBA that does not govern the non-compete which gives rise to its grievance. Neither are the arbitration provisions of the CBA or NBPA regulations available to ISE, since these provisions are only available to agents who want to challenge the NBPA's decision to deny or revoke certification. Notice, Ex. C § D–E.

Moreover, once again, the merits of the dispute *must be decided by JAMS pursuant to the parties binding arbitration agreements.* Bauman Decl., Ex. D § 14, Ex. F § 9.1. No such dispute can be decided by the NBPA or by any state or federal court. The only issue before the state court that Fegan improperly removed was a request for preliminary injunctive relief pending the outcome of the JAMS arbitration. It defies common sense to suggest that the federal courts could have "exclusive jurisdiction" over the APA under the circumstances.

**C. Removal was Also Improper because Fegan's Extensive, Substantive, and Voluntary Use of the State Court System, and the Rights Afforded to Him Thereunder, Waived any alleged Right to Remove to Federal Court**

This Court also has the discretion to remand the case in light of Fegan's conduct in state court, which waived any right to seek removal (which is improper in any event for the reasons discussed above).

A defendant "may waive the right to remove to federal court where, after it is apparent that the case is removable, the defendant takes actions in state court that manifest his or her intent to have the matter adjudicated there, and to abandon his or her right to a federal forum." *Acosta v. Direct Merchants Bank,* 207 F. Supp. 2d 1129, 1132 (S.D. Cal. 2002); *Aqualon v. MAC Equip., Inc.,* 149 F.3d 262, 264 (4th Cir. 1998) ("A defendant may waive the right to remove by taking some substantial defensive action in the state court *before* petitioning for removal.") (emphasis in

original); 10 James W. Moore, et al., *Moore's Federal Practice,* § 107.18[3][a] ("Participating in state court proceedings, such as seeking some form of affirmative relief, when the defendant is not compelled to take the action . . . constitutes a waiver of the defendant's right to remove to federal court."); *See generally Rosenthal v. Coates,* 148 U.S. 142, 147 (1893) (stating that a party may not experiment on his case in state court) (internal quotations omitted).

In *Acosta*, the court held that a defendant waived his right to remove to federal court after he filed a cross-complaint in state court. *Acosta*, 207 F. Supp. 2d at 1132–33. A defendant was also found to have waived his right to remove to federal court after he "serv[ed] Plaintiff with discovery requests . . . fil[ed] a motion to dismiss . . . and schedule[ed] a state court hearing on the motion." *Chavez v. Kincaid*, 15 F. Supp. 2d 1118, 1125 (D.N.M. 1998); *see also Moore v. Permanente Med. Grp., Inc.*, 981 F.2d 443, 447–48 (9th Cir. 1992) (noting district court's decision to remand case to state court because the defendant had waived his or her right to remove a case to federal court after an adverse decision and after the defendants had moved to transfer venue in state court).

Here, Fegan did not seek removal until after he had: appeared at three separate hearings on ISE's TRO; lost the TRO; noticed and re-noticed depositions; stipulated to the briefing schedule and hearing date for the MPI; challenged the judge who issued the TRO in order to get a new judge to hear the MPI and was assigned a new judge; reviewed ISE's supplemental MPI papers filed pursuant to the stipulated briefing schedule; and waited until the evening before his opposition to the MPI was due, only 8 court days before the hearing on the MPI was to take place, too late for a new hearing to be set by any court except on an emergency basis. Evans Decl. ¶ 16. This is gamesmanship at its worst. While Fegan may argue that none of these actions standing alone would be enough to constitute a waiver, collectively they demonstrate an intent to litigate the TRO and preliminary injunction until Fegan lost the TRO and

believed he would lose the MPI, and, and therefore removed the case for the sole purpose of thwarting ISE's right to injunctive relief.

Fegan's "wait-and-see" approach, testing the waters of state court to see how far he could game the system to his advantage, should not be tolerated. "[A] defendant may not experiment in state court and then seek to remove upon receipt of an adverse ruling." *Foley v. Allied Interstate, Inc*., 312 F. Supp. 2d 1279, 1285 (C.D. Cal. 2004) (citing *Moore*, 981 F.2d at 447; *Acosta,* 207 F. Supp. 2d at 1131. Such an obvious attempt to forum shop for new judges makes a mockery of federal removal jurisdiction.

## V. CONCLUSION

For the reasons stated herein, the Court should grant ISE's Motion to Remand this case back to its proper venue in Los Angeles Superior Court. In addition, the Court should issue "just costs and any actual expenses, including attorney fees, incurred as a result of the removal" due to the meritless nature of Fegan's removal. 28 U.S.C. § 1447(c).

Dated: March 31, 2017

Gibson, Dunn & Crutcher LLP

By: */s/ James P. Fogelman*
James P. Fogelman

Attorneys for Plaintiff Independent Sports & Entertainment, LLC